**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AUGUST R. COSTA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-854 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| COMMONWEALTH OF | ) | |
| PENNSYLVANIA DEPARTMENT | ) | |
| OF REVENUE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 20) will be granted.

## BACKGROUND

Plaintiff has brought this lawsuit under Title VII, alleging that his former employer terminated him in retaliation for having complained of sexual harassment by his supervisor, Terri Hopkins.  Compl. (Doc. 1).[1]  Plaintiff worked as a District Lottery Representative ("DLR") in Defendant's Pittsburgh Office from 2005 until his termination in August 2010.  Pl.'s Resp. to Def.'s Stmt. of Facts (Doc. 25) at ¶ 1.  Although Plaintiff had several different supervisors, at all relevant times he reported to Ms. Hopkins in her capacity as "Area Manager."  *Id.* at ¶¶ 5, 6.

---

[1] Plaintiff's Complaint originally stated three Counts, sexual harassment (Count I), retaliation (Count II) and violation of the PHRA (Count III).  *Id.*  Plaintiff previously stipulated to the dismissal of his PHRA claim as barred by the Eleventh Amendment.  *See* Doc. 7.  As will be explained below, moreover, Plaintiff's sexual harassment claim is both time-barred and fails on the merits because the alleged harassment promptly ceased after he complained.  Thus, the focal point of this decision will be his retaliation claim.

Plaintiff claims that, between the years 2005 and 2007, Ms. Hopkins subjected him to an ongoing course of sexual harassment.  Specifically Plaintiff alleges that Ms. Hopkins attempted to initiate a sexual relationship with him through "flirtatious, unprofessional and unwelcome conduct."  *See* Pl.'s Opp'n Br. (Doc. 24) at 2 (citing record evidence).  Among other things, Plaintiff claims that Ms. Hopkins repeatedly called him on his personal telephone, outside of business hours, to discuss matters unrelated to work; she invited him out for drinks; she wore short skirts and low-cut blouses, and would cross her legs in front of Plaintiff and bend down to pick things up off the floor; she would brush against him; and, during one work outing, she invited him to her hotel room.  *See id.*

Plaintiff claims that this conduct continued until "late 2007," or "the fall of 2007," when he complained to Defendant's executive director Ed Trees.  *See generally* Pl.'s Resp. to Facts (Doc. 25) at ¶¶ 7, 157.  In speaking to Mr. Trees, Plaintiff did not go into detail regarding Ms. Hopkins's alleged conduct, but rather spoke of office rumors regarding an alleged affair between her and Plaintiff:

> I went to [Mr.] Trees about the rumors of us having an affair, [and said] I would like for them to stop because [Ms. Hopkins] did nothing to stop those and [she] thought it was humorous. . . .  I also explained to him that she gave me personal cell phone calls in the evening.  I did not discuss what went on [in] those particular phone calls[, but said that] I would like for [them] to stop, and [that] I would just like to be treated like every other employee.

*See* Pl.'s Dep. Tr. at 105 (attached under Doc. 21-1 at pg. 115 of 209); *see also id.* at 118-19 (admitting that he did not advise Mr. Trees regarding Ms. Hopkins asking him out for drinks, wearing revealing attire, asking him to her hotel room, *et cetera*).

In response to Plaintiff's complaints, Mr. Trees asked him to discuss the matter with

Ms. Hopkins directly, and he did so.  *See id.* at 115.  Regarding his discussion with Ms. Hopkins,

Plaintiff has testified:

> A.   I went in and asked if I could close the door.  She said yes.  She [said,] I know you met with Ed Trees[,] . . . what happened?  [I] told him about the personal cell phone calls that you make to me and how you are not squashing the rumors about me and you having an affair.  I feel it's your duty as the . . . area office manager . . . to squash that.  And [Mr. Trees] had advised me to tell you [about my complaints] if I felt comfortable enough, which I do because . . . we get along very well . . . .  I said, Terri, I think all the personal cell phone calls should stop.  The perception of us having an affair has to stop[,] and basically that[ was] it.
>
> Q.   What did she say?
>
> A.   She said it won't occur anymore.
>
> . . . .
>
> Q.   No rage, or upset, or anger, anything like that?
>
> A.   I didn't witness anything.
>
> Q.   . . . .  [A]fter that did you get any more calls on your personal cell phone from [Ms. Hopkins]?
>
> A.   No.
>
> Q.   Any[ ]more provocative or odd approaches to you like that?
>
> A.   No.
>
> Q.   That all stopped?
>
> A.   Yes.

*Id.* at 117-18.

Plaintiff claims that, although Ms. Hopkins's purported sexual advances promptly ceased, she retaliated against him by initiating a "series of disciplinary actions" within two months of his complaints, and she "continued to discipline [him] over the years, which eventually had a direct influence and impact on the termination of [his] employment."  Pl.'s Opp'n Br. (Doc. 24) at 2.

Given that Plaintiff was terminated nearly three years after his discussions with Mr. Trees and Ms. Hopkins, and notwithstanding his long and checkered history of work misconduct reflected in the record, Plaintiff attempts to string together a series of purportedly retaliatory actions on behalf of Ms. Hopkins.  Contrary to Plaintiff's suggestion, however, individuals in Defendant's organizational hierarchy above Ms. Hopkins perceived problems with Plaintiff's behavior in advance of his 2007 complaints.  The record also reveals incidents having little or no involvement by Ms. Hopkins, as well as instances of threatening and unprofessional behavior plainly admitted by Plaintiff.

The incidents are identified by approximate date and summarized below.  The Court acknowledges that Plaintiff would, and does, dispute certain aspects of these summaries. While the Court remains mindful of its obligation to view the evidence in a light most favorable to Plaintiff, allowing him to recast every unfavorable aspect of the record would cause all discussions to degenerate into an endless cycle of "he said, they said."  It suffices to say that, even accepting Plaintiff's interpretations to the extent they are remotely reasonable, Defendant nevertheless has demonstrated its entitlement to summary judgment.[2]

---

[2]  To the extent possible, the Court will rely on reports reflecting the positions taken by Plaintiff contemporaneous with the incidents.  Although the reports were generated by persons within Defendant's organization, much of their content parallels Plaintiff's current positions, or, at least, he does not deny having taken them at the time.  To the extent that the reports meaningfully differ from Plaintiff's current assertions, the Court will so highlight.

**Incident in May 2006**

In an email dated May 25, 2006, Defendant's human resources director, James Honchar,

reported to other of Defendant's superiors as follows:

I received a call from Tom [Blaskiewicz, Defendant's deputy executive director
of retail operations] today.  Apparently there were a couple issues with [Plaintiff].
. . . [Mr. Blaskiewicz] reported the following:

1.  [Plaintiff] was very confrontational with [Ms. Hopkins] over the use of
[computer] notebooks.  While in part this is due to [a] lack of supervision . . .,
[Plaintiff] hasn't used his notebook in 4 weeks.

2.  [Plaintiff] was bragging how he referees sporting events and doesn't report it
on his financial disclosure or state ethics forms.

3.  [Plaintiff] doesn't have any approved supplementary employment for this
activity.

4.  It's also possible he didn't report this income on his PIT taxes.

[Mr. Blaskiewicz also] indicated that [Plaintiff] was out of line and rude to
[Ms. Hopkins].

*See* email (copy attached under Doc. 21-1 at pg. 187 of 209).  Mr. Honchar closed by asking one

of the email recipients, Defendant's deputy secretary of administration, Barry Drew, whether

there was "someone who wanted to give [Plaintiff] the dutch uncle speech," or whether Plaintiff

should be "turn[ed] over to the [Office of the Inspector General] and have them deal with these

issues . . . ." *Id.*

Plaintiff denies the accusations in this email, and there are disagreements regarding the

outcome of these reported incidents and whether he was "disciplined" as a result.  *See, e.g.*,

Pl.'s Resp. to Facts (Doc. 25) at ¶¶ 7-13.  He does not, however, dispute that Messrs. Honchar

and Blaskiewicz so reported the incidents, nor does he allege that the sender or recipients of the

email acted toward him with discriminatory or retaliatory animus.

5

**"Fall of 2007"**

Plaintiff allegedly complained of sexual harassment to Mr. Trees and Ms. Hopkins. *See* discussions *supra*.[3]

**January 2, 2008**

This is the first instance of "retaliation" purportedly undertaken by Ms. Hopkins after Plaintiff complained of sexual harassment.  In connection with Plaintiff allegedly being required to perform work exceeding his medical restrictions, he stated to Ms. Hopkins:  "If you were a man, I would punch you in the head."  *See* Pl.'s Opp'n Br. (Doc. 24) at 8-9.  As a result of this and other allegations of misconduct, Plaintiff received a two-day suspension.  Although Plaintiff admits to making this statement, he disputes the underlying merits of the medical-restriction issue and suggests that his comment was taken out of context and did not cause Ms. Hopkins to feel threatened.  *See id.*; *see also* Pl.'s Resp. to Facts (Doc. 25) at ¶ 29.

In an email regarding the incident, Plaintiff's superior and director of retail operations, Bob Siodlowski, wrote to Defendant's chief of labor relations, Mike Garman:  "Mike, thanks. [Plaintiff] has had issues all along."  *See* email (attached under Doc. 21-2 at pg. 37 of 162).

**February 6, 2008**

A female coworker, who the parties have been referring to as "Jane Doe," submitted a written witness statement to Ms. Hopkins, who acted as her supervisor, accusing Plaintiff of

---

[3]  Defendant disputes that Plaintiff's statements to Mr. Trees qualified as "protected activity" under Title VII, and the Court is inclined to agree.  Plaintiff responds, however, that the complaints he directed to Ms. Hopkins, his supervisor and the alleged harasser, qualify. The Court declines to reach this issue, given the clear lack of causal connection between Plaintiff's complaints and his termination.  A more important point, though, is the complete lack of evidence, or even a reasonable inference, that *any* of the decisionmakers regarding Plaintiff's discipline, up to and including his termination, were aware of Ms. Hopkins's purported complaints of sexual harassment or retaliatory animus.

making harassing comments. *See* Doc. 21-2 at pg. 49 of 162. Among other things, Jane Doe accused Plaintiff of stating that, "if [she] want[ed] to get a date[, she] should go to a bar and lift up [her] dress"; he repeatedly asked her for phone "massages" instead of "messages"; he called her "babe" and "sweetie"; and asked her whether she and a female co-worker "came in early every morning to 'knock one off.'" *Id.*

In a report regarding the incident, Defendant's human resources director, Linda Miller, summarized Plaintiff's responses to the incident during a pre-disciplinary conference. Among other things, the report stated:

> [Plaintiff] was asked if he ever used pet names such as "sweetie" and "babe" when addressing Ms. [Doe]. [Plaintiff] admitted he had and he continued to use these pet names when addressing [her]. [Plaintiff] explained that it is very common for him to speak like this and he claimed it was a habit. He also claimed he saw nothing wrong with it.

> [Plaintiff] also admitted he would ask Ms. [Doe] for his "massages" when he called into the office. He explained that he did this to break up the monotony. He indicated he meant nothing sexual by it and would even say the same thing if a guy would have answered the phone. [Plaintiff] claimed he did not find this comment offensive because Ms. [Doe] knew exactly what he meant. There was no sexual overtone prior, during, or even after he used the word.

> [Plaintiff] denied ever making the ["knock one off"] comment. . . .

> When asked if he believed that his actions toward Ms. [Doe] could be viewed as hostile or offensive, [Plaintiff] stated, "Never that way. No." When asked a follow-up question about whether he believes that using unwelcome pet names to address someone in the workplace is appropriate, [Plaintiff] stated, "If you're saying it's unacceptable, it's unacceptable. There are different degrees. For example, if I was saying it to four girls but not the fifth girl, that's different than saying it to all five girls. It's just my nature and every instance is different. I use the names with all my friends and unfortunately I have in the past, too. I won't do it in the future. I have slipped up with all females, but it's just who I am. Unfortunately, it's a very hard habit to break, so spank my hands."

*See* Doc. 21-2 at pg. 61-62 of 162.

According to the report, Plaintiff's union steward stated in his defense, "this is the way [Plaintiff] addresses people. [He] knows and works on the way he acts. It's a cultural thing, but not right for the office." The union steward stated that he "agree[d that] it is inappropriate, but [Plaintiff] grew up in East Liberty, so that's how it is here. It's a Pittsburgh thing."

In his opposition papers, Plaintiff denies that Jane Doe's allegations equated to sexual misconduct or harassment. *See* Pl.'s Resp. to Facts (Doc. 25) at ¶ 43. He again claims that his comments were taken out of context, and he asserts that Jane Doe "had a self serving interest in complaining [because] she received a promotion and raise immediately after the alleged incident." *Id.* at 51. Regarding the "lift up your dress" comment, Plaintiff denies saying this, and asserts that, "[i]n fact, [he] stated to the female employee, 'You [have] got to watch yourself out there, it's a rough scene.'" *Id.*[4]

Plaintiff identifies no evidence in the record from which it reasonably may be inferred that Ms. Hopkins caused Jane Doe to fabricate her report, nor does he support his apparent inference that Ms. Doe made false statements to obtain a promotion and raise.[5]

---

[4] Plaintiff's denial of this incident is strange, given the divergent language reported by Jane Doe ("lift up your dress") and himself ("watch yourself out there, it's a rough scene"). Plaintiff's denial would appear more forceful had he just disclaimed the statement, rather than explaining that he used dissimilar language expressing an unrelated sentiment. The Court cannot pass on Plaintiff's credibility, however, and it must take Plaintiff's claims as it finds them.

[5] Aspersions regarding Ms. Doe aside, Plaintiff argues that Ms. Hopkins's handling of her written complaint evinces retaliatory animus because she responded more aggressively to the complaints against him than did Mr. Trees to Plaintiff's complaints regarding Ms. Hopkins. *See* Pl.'s Opp'n Br. (Doc. 24) at 10-11. This argument relies on a number of false equivalences, including the form and nature of Plaintiff's complaints versus Jane Doe's (*i.e.*, verbal complaints to Mr. Trees, and then Ms. Hopkins, regarding "personal cell phone calls" and "rumors" regarding a purported affair, versus written complaints alleging specific, sexually suggestive comments) and the circumstances surrounding the complaints (*i.e.*, Mr. Trees's alleged request that Plaintiff address his verbal complaint with Ms. Hopkins, which he agreed to do, versus Jane Doe's submission of written complaints regarding Plaintiff to Ms. Hopkins, her direct supervisor). In the end, this is much ado about little because Plaintiff has not, and cannot, show a causal connection between his complaints in 2007 and his termination in 2010.

The incident resulted in an EEO investigation, and, although Defendant's chief of labor relations recommended a suspension, the suspension was negotiated through the grievance process to a written reprimand.  *Id.* at ¶¶ 55-56.

**January through March 2010**

After a period of over 500 days without a disciplinary incident, Plaintiff received a three-day suspension for incidents occurring in January and February 2010.[6]  The incidents leading to the disciplinary action were as follows.

On January 11, 2010, Plaintiff commented to Ms. Hopkins that he was upset with a co-worker, Rick Cordero; that if he was ever asked to work in Mr. Cordero's district again he would call in sick; and that she "had better move Rick['s location] at the staff meetings or [Plaintiff] wouldn't be responsible if his elbow hit Rick in the head."  *See* rpt. dated Mar. 18, 2010 (filed under Doc. 21-2 at pg. 80 of 162).  In a written summary, one of Defendant's EEO officers described as follows Plaintiff's response:

> In my [third] suspension[,] I was accused of making a threatening comment.
> I was instructed to help another DLR[,]Rick Cordero.  I became frustrated with
> [Mr.] Cordero and made the comment to Terri Hopkins, "[y]ou better move Rick
> at the staff meetings or I won't be responsible if my elbow hits him in the head"
> or something similar to that.  The comment was misinterpreted by Ms. Hopkins as
> a threat against another co-worker.  I was clearly saying it in a joking manner,
> and Mr. Cordero stated that he did not interpret it as a physical threat.

---

[6]  Plaintiff's union grieved the three-day suspension and, post-termination, the suspension was removed from Plaintiff's personnel file pursuant to a settlement agreement entered between the union and Defendant's labor relations division.  *See* Doc. 24-4 at pg. 66 of 139.  Plaintiff has failed to identify evidence in the record supporting his assertion that the removal was based on a determination that "he did not commit any of the alleged misconduct."  *Cf.* Pl.'s Opp'n Br. (Doc. 24) at 12 (claiming exoneration, but citing evidence (Exhibit 55) revealing that grievance had been *settled*).

*See* Doc. 21-2 at pg. 86 of 162.  Although Plaintiff has submitted the testimony and written statements of Mr. Cordero in opposition to summary judgment, the Court's review of the record has failed to identify any evidence in those materials addressing Plaintiff's "elbow to the head" comment.[7]

Plaintiff's 2010 suspension also was based on his having missed a training session scheduled for February 2, 2010 and being rude to Ms. Hopkins by hanging up on her.  *See* Pl.'s Opp'n Br. (Doc. 24) at 12-13 (citing record evidence).  Two of Plaintiff's superiors, Bob Siodlowski (director of retail operations) and Margaret Dellana (district lottery supervisor) prepared written statements regarding the incident.  Mr. Siodlowski reported:

> On 2/2/10[,] I was in the Pittsburgh office to facilitate mandatory . . . training because of changes to the on-line gaming contract.  About 5 minutes before start time I asked if everyone was here so we could start class and was informed that [Plaintiff] was missing.  About 10 minutes pas[t] the start time, I asked if anyone knew where he was.  His manager called him and as she was talking to him she indicated he hung up on her.  Based on the fact that he was at a retailer that was about 15 minutes away, I said we are not waiting any longer since everyone else was on time.  We then started the training class and after completing my work related to the training I went to an office to work on another project.  [I am n]ot sure how much time passed but [Plaintiff] came into the office I was working in and apologized for being late.
>
> I was informed after the pre-disciplinary conference with [Plaintiff], that he said that [when] he came to apologize to me, I said [okay].  I do not recall if I said that or not but I certainly did not mean to infer that it was [okay] to be late and to hang up on your manager as she is talking to you on the phone.  Rather[, I would have

---

[7] Plaintiff's assertion that he was just "joking" regarding Mr. Cordero appears both illogical and immaterial.  It is illogical because Plaintiff, in the same statement, admitted that he was frustrated with Mr. Cordero at the time.  It is immaterial because it was Ms. Hopkins's perception, not Mr. Cordero's, that was potentially relevant, and there is no indication that Mr. Cordero was present during the discussion or stated opposition to Plaintiff's being disciplined because he did not feel threatened.  *Cf.* Rpt. of S. Hastings dated Mar. 18, 2010 (attached under Doc. 21-2 at pg. 81 of 162) (summarizing Plaintiff's response to incident, including admission that Mr. Cordero was unaware of "elbow" comment).  The Court cannot help but observe that Plaintiff seems to have excuses and rationalizations for any number of work-related misbehaviors, and there is no shortage of either in the record.

meant] that it was [okay] because there [was] a class [the next day] and he was only penalizing himself and not anyone else.

It was my recommendation that Labor Relations be contacted regarding [Plaintiff's] behavior of not being on time for the mandatory training and for his behavior towards his manager when she called.

Doc. 21-2 at pg. 66 of 162.

On the day of the incident, Ms. Dellana reported:

At 9:40am, I was talking to Kathy Fiedler, DLR.  She told me that [Plaintiff] called her to ask her a question about a [r]etailer they both have.  She said to him[,] where are you[,] we have . . . training today and he stated, I thought that was tomorrow.  He said he had three more stops to make and he would be in. She said it starts at 10:00am.  At 10:00am my Area Manager, [Ms.] Hopkins said, we are starting where is [Plaintiff].  [Ms. Hopkins] dialed his number and handed me the phone, he was at a [r]etailer location.  I said, . . . the meeting is starting and we are waiting on you. . . .  Where are you?  He said[,] I have a question about a [r]etailer[,] and I said that is going to have to wait, you [need] to get here now.  I said [Mr.] Siodlowski was getting ready to address the group and we were waiting on him.  He said ok[ay].

When I hung up with him I told Terri he was still at a [r]etailer and he was leaving.  She said what [r]etailer and how far.  I didn't know so she called him back and said[,] where are you?  He said I'm leaving now and she continued to tell him he was already 10 minutes late but he had hung up on her.  At 10:30am he showed up for the meeting.  [Mr.] Siodlowski told [Ms.] Hopkins to have him leave and come back for the next day meeting at l0am. . . .

Doc. 21-2 at pg. 68 of 162.

In a statement regarding events occurring three days later, Ms. Dellana wrote that

Plaintiff was highly upset to learn that the incident had been written up by Defendant's chief of

labor relations, Stacy Hastings:

I said[,] I have a letter to give to you but your original copy is in [Ms. Hopkins's] office.  I printed a copy and . . . [h]e said who is it from[,] and I stated Stacy Hastings.  He [asked,] who is Stacy[,] and I said she is from HR . . . .  He said[,] "am I in trouble . . . this is ridiculous."  He read the letter and was pretty upset and stated[,] this is coming from [Ms. Hopkins].  That he is a target.  I told him that Bob [Siodlowski] was there when he hung up on her and that he advised her on

> how to proceed.  He read more and[, regarding the "elbow him in the head" incident,] said "Rick [Cordero] and I don't have a problem and I will bring him in . . .  This is just the way I talk and I really didn't mean it literally. . . ."

> [Plaintiff] said "all gloves are off."  "Last time I didn't want to make a big deal out of things but this time I am."  He stated "I want her [*i.e.*, Ms. Hopkins's] job." He said that this is personal and she is just going after him.  I said that he could discuss this all on Monday and we really shouldn't get into this now. . . . [Plaintiff] said, I'm taking the rest of the day off[,] I have a lot of phone calls to make.  I told him that the letter stated he could have someone from the union there and he said no.  I said I would suggest that he did.  He said he is going further than the union, his attorney. . . .  He told me to stay clear from this that it was going to get ugly and that he already made five phone calls.  I just listened and did not respond.

Doc. 21-2 at pg. 69 of 162.

A pre-disciplinary conference was held on February 17, 2010, and Ms. Hastings summarized the discussions in a memorandum requesting Plaintiff's suspension.  *See* Doc. 21-2 at pgs. 79-84 of 162.  In the "employee's explanation" section, Ms. Hastings noted that Plaintiff "denied hanging up on [Ms. Hopkins].  He said he was on his way and ended the call because 'he was in the middle of something.'  He said he was not aware that [Ms. Hopkins] was still talking."  *Id.* at pg. 82 of 162.  Plaintiff now, in the course of this litigation, claims that the "call dropped."  Pl.'s Resp. to Facts at ¶ 65.  Notably, however, Plaintiff has neither claimed nor implied that the persons reporting the hang up/accidental hang up/dropped call, namely, Mr. Siodlowski and Ms. Dellana, were aware of Plaintiff's purported complaints of sexual harassment.  Nor is Ms. Hopkins attributed with the paranormal ability to make cellular telephones lose their signal.

As to his purported comments regarding the "gloves being off," which Ms. Dellana later described as "threatening and inappropriate," *see* Doc. 21-2 at 74, the February 17th report described similar responses by Plaintiff during the pre-disciplinary conference.  *See* Doc. 21-2

12

at pg. 82 of 162 (reporting that Plaintiff stated, "[e]veryone has to do what they have to do,"
and that, "[j]ust like you are going after my job, I'm going after [Ms. Hopkins's] job"); *cf.* Pl.'s
Resp. to Facts at ¶¶ 76-77 (admitting that Plaintiff voiced "his displeasure with the meritless
accusations, but did not say the exact words quoted by Defendant").  Plaintiff's union steward
asked "if [Defendant's supervisors] have ever just talked to [him].  Ms. Hopkins and Ms. Dellana
responded by saying that many people have talked to [Plaintiff] regarding his behavior and they
have overlooked a lot of things.  [The union representative] said he believes there is an inner
circle where employees are protected but if you are not part of it, you are not protected.  He said
that [Plaintiff] may feel like he is being attacked and that is why he sometimes responds the way
he does."  Doc. 21-2 at pg. 83 of 162.

In closing her report, Defendant's chief of labor relations summarized the employer's
perceptions regarding Plaintiff's conduct:

> [Plaintiff]'s behavior and comments towards [Ms. Hopkins] may not seem
> extremely serious but they are a continuation of a pattern of concerning comments
> and behaviors towards her that must be addressed.  In the past, he has admitted to
> making the statement that he would punch Ms. Hopkins if she were a man and
> that working for females is difficult for him, although he claims he only meant it
> would be different [to work with a man], not better.  His open disregard for her
> and her position continues to be unacceptable and cannot be tolerated.
>
> He has acknowledged making many of the comments attributed to him but acts
> like it is not his fault and he's not concerned how his manager perceives these
> comments.  Any reasonable person would find the comments:  "All gloves are
> off" and "I want her job" as threatening and intimidating.
>
> It should also not be forgotten that he has made inappropriate and threatening
> comments about a co-worker as well.  Again, he claims, as he has in the last two
> [pre-disciplinary conferences], that these comments are taken out of context.
> When provided the chance to explain what he said or meant, he refuses.  This is
> ridiculous.  It is difficult to twist or take out of context the comment that his
> manager better move Rick [Cordero] at the staff meetings or he wouldn't be
> responsible if his elbow hit [him] in the head.  There is no other context that this
> statement could be made.  [Plaintiff] meant what he said when he made the
> statement.

> [Plaintiff] shows no signs of remorse or acknowledgment that this behavior is wrong and inappropriate.  His past behaviors, which have been addressed through serious discipline, have not resulted in any significant change in his behavior.  He is a very short-[tenured] employee who believes that he does not have to follow the rules and/or respect his manager and co-workers due to his political connections.  He is wrong.

Doc. 21-2 at 83 of 162.

By the time of Plaintiff's March 2010 disciplinary proceeding, it is evident that Plaintiff believed, or claimed to believe, that he was being "singled out" for adverse treatment by Ms. Hopkins.  Although the Court does not believe any reasonable factfinder could conclude that every instance of reported misconduct and/or discipline somehow was orchestrated by Ms. Hopkins, the comments of Plaintiff's union representative at the February 17th conference are telling.  Specifically, the representative made reference to Plaintiff not being "protected" in the "inner circle," and this accusation is echoed by Plaintiff's assertions during the time of his employment.  As far back as March 2008, Plaintiff described his work environment as "[v]ery cut-throat[, v]ery cunning.  For lack of a better word – out to get certain people.  I saw it happen in the past; I see it happening to me presently.  [The prior victims of this perceived conduct] both happened to be males. . . .[8]  I've seen favoritism.  It's not so much how [well] you do your job; it's more who you kiss up to."  *See* Pl.'s "Employee Statement" dated Mar. 27, 2008 (attached under Doc. 21-2 at pg. 118 of 162).[9]

---

[8]  Despite here-and-there references in Plaintiff's opposition papers to the disparate treatment of male employees generally, his Complaint does not state a claim for gender discrimination. *Cf.* Compl. at Count I (alleging "sexual harassment" and "hostile work environment" based on Ms. Hopkins's "unwanted sexual advances").  Plaintiff has not sought leave to amend, and it is too late in the day to entertain such a request.

[9]  Plaintiff refused to sign his March 2008 statement, "per [his] attorney's advisement," although, paradoxically, he made several handwritten revisions to the document and initialed them. *See* Doc. 21-2 at pgs. 118-126 of 162.

Similarly, on more than one occasion, Defendant's reports highlighted Plaintiff's assertion that his good relationship with Ms. Hopkins "eroded" as "a result of [his] refusal to provide her with 'dirt' concerning other employees in her chain of command." *See* summary of Plaintiff's telephone interview with Defendant-EEO specialist in April 2010 (Doc. 21-2 at pgs. 86-88 of 162); *see also* Doc. 21-2 at pg. 119 of 162 (notes of March 2008, claiming that Ms. Hopkins "was feeding [Plaintiff] information personal and business-wise" regarding two other employees "in order to get them fired"; after meeting with Mr. Trees, Plaintiff told Ms. Hopkins that "[he] wasn't trying to get anyone fired and that Mr. Trees assured [Plaintiff] that that wouldn't occur"; and that, "[b]efore that, [Ms. Hopkins] and I were talking, but that's when that changed") (emphasis added).  Even assuming Plaintiff's perceptions were true, they do not reflect retaliatory animus, and the Court's review of Plaintiff's substantial employment record has failed to reveal a *single instance* in which Plaintiff contemporaneously stated or implied that Ms. Hopkins had retaliated based on complaints of sexual harassment. That theory appeared, for the first time, in his EEOC charge.  *See* Doc. 21-2 at pg. 133 of 162.

**The EEO Investigation Initiated in Early 2010 at the Behest of Plaintiff's Cousin, Pennsylvania State Senator Jay Costa, Jr.**

The reference in Defendant's February 17th Report to "political connections" now seems prophetic, as Senator Costa initiated an investigation at Plaintiff's behest.[10]  Senator Costa has signed a declaration stating that:  Plaintiff contacted the Senator in 2006 to express his belief that

---

[10]  It appears that Plaintiff has no shortage of political connections in state and local government. *See* Pl.'s Dep. Tr. at pg. 13 (filed under Doc. 21-1 at pg. 92 of 209) (identifying relationships with county councilman, and familial ties to one State senator and one State representative). Indeed, Plaintiff asked his cousin, Senator Costa, for assistance in getting his position with the Pennsylvania Department of Revenue.  *Id.* at 131 (filed under Doc. 21-1 at pg. 92 of 209); *cf. also* Doc. 21-1 at pg. 187 of 209 (first communication regarding perceived problems with Plaintiff's employment, including reference to potentially giving him "the dutch uncle speech," and asking, "I think this may have been the Secretary's candidate?").

he was being treated poorly in response to his participation in union activities (conduct not alleged in this lawsuit); Plaintiff contacted him in 2008 regarding "meritless discipline" that occurred after he complained to Ms. Hopkins and Mr. Trees regarding "rumors of an affair," "excessive off-duty calls . . . and sexual harassment"; and Plaintiff contacted the Senator again in February 2010 "regarding unfair and disparate treatment and unwarranted discipline directed toward him." Doc. 24-4 at pg. 119-20 of 139. Accordingly, Senator Costa contacted Pennsylvania's Secretary of Revenue, C. Daniel Hassell, and requested that his cousin's allegations be investigated and that "a report of the . . . findings be [submitted] to [the Senator's] office." *Id.* According to Senator Costa, on May 25, 2010, Secretary Hassell and Deputy Secretary Barry Drew provided him "with an oral report of their findings of the internal investigation conducted by EEO stating that [his cousin] was not the subject of unfair or disparate treatment or unwarranted discipline." *Id.* Senator Costa's declaration expresses dissatisfaction with Defendant's failure to provide him a written report of findings regarding his cousin's grievances. Apparently, any displeasure the Senator may have felt towards his cousin's alleged harasser was insufficient to dissuade him from lending support to the request of her "boyfriend" for a pay raise and promotion. *See id.* at ¶ 7.[11]

Contrary to a single, offhand comment contained in Plaintiff's opposition papers, neither his pleadings nor his EEOC charge identify Plaintiff's complaints to Senator Costa as "protected activity" for the purposes of this lawsuit. *Compare* Pl.'s Opp'n Br. (Doc. 24) at 14

---

[11] Although the Court is firmly convinced that this case cannot survive summary judgment, it finds interesting Plaintiff's, and his counsel's, apparent lack of concern regarding the open displays of nepotism reflected in the record. Although, in the current economy, a person cannot be faulted for utilizing every "leg up," Plaintiff appears to lack self-awareness regarding how his expectations of his Senator-cousin might be perceived by a neutral observer. Although politicians certainly serve at the pleasure of their constituency, the Court wonders how the Senator's other constituents, the public or a potential jury would respond to Plaintiff's frequent requests for intervention and the Senator's willingness to oblige.

("[Ms.] Hopkins was aware that [Plaintiff] requested that his cousin . . . initiate [an]

investigation, . . . which constitutes protected conduct") *with* Compl. (Doc. 1) and EEOC charge

(attached under Doc. 21-2 at pg. 133 of 162) (containing no reference to same).

**The Incident on June 26, 2010, Defendant's Investigation and Plaintiff's Termination**

On June 26th, two of Plaintiff's supervisors, Jean Gill and Ms. Hopkins, tried to reach him

by telephone so that they could coordinate delivering to him promotional tickets. *See* email of

Ms. Gill (attached under Doc. 21-1 at pg. 179 of 209). Mses. Gill and Hopkins both tried

telephoning Plaintiff, and neither was able to reach him. Shortly thereafter, at approximately

2:00 p.m., Plaintiff returned Ms. Gill's call and stated that he was at home, and that he had

stopped there to call a person in Defendant's IT department to discuss problems he was having

with his computer. *See* Pl.'s Resp. to Facts (Doc. 25) at ¶ 105. Ms. Gill's notes at the time

indicated that she did not confront Plaintiff about being home in the middle of the work day,

although she did report the incident to Ms. Dellana. *See* Doc. 21-1 at pg. 179 of 209.

Ms. Hopkins also reported the incident, to Ms. Hastings in labor relations. *Id.* at ¶ 107.

Although Plaintiff disputes Defendant's legal contention that Ms. Hopkins had "no input"

regarding Ms. Hastings's reaction, he does not dispute that Ms. Hastings independently

determined and directed that Plaintiff's telephone records should be investigated. *See id.*

at ¶¶ 108-109; *cf. id.* at ¶¶ 107, 109 (arguing that Ms. Hopkins "selectively decided [which]

issues she would report up her chain of command," and that, by "initially report[ing] the

incident" to Ms. Hastings, Ms. Hopkins "affect[ed] the outlook of [her] superior" regarding

incident). The investigation revealed a number of inconsistencies between Plaintiff's statements

regarding his work-day and his actual conduct and locations. *See id.* at ¶¶ 110-11. Plaintiff

vociferously disputes the inconsistencies, attacking both the alleged contents of his self-reports

and the veracity of his cell phone records because his phone "use[d] various cell phone towers to connect, making it appear that [Plaintiff] was in a different location" than he actually was. *See, e.g., id.* at ¶¶ 110-11.

In any event, Ms. Hastings found several instances of suspicious activity, and she directed Ms. Gill to gather computer and other records regarding Plaintiff to examine his activities. *Id.* at ¶ 111. The records revealed inconsistencies, a great number of which were outlined contemporaneously and are recited in Defendant's moving papers. Plaintiff, on the other hand, offers an impressive list of counter-explanations and challenges to the accuracy of the reports. *See, e.g., id.* at ¶ 110 (denying that he told Ms. Gill he called IT before 2:00 p.m., which was perceived as inaccurate by his superiors because phone records revealed that his call to IT was placed at 2:21 p.m.; Plaintiff contends that he had not told Ms. Gill that he already had called IT, only that he had gone home for that purpose); *id.* at ¶ 112 (disputing contents of computer generated reports because Defendant did not submit them in summary judgment record); *id.* at ¶ 113 (asserting that he had no computer access for three months because his computer was stolen, and it took some time for Defendant to replace it with one that was fully functional); *and id.* at ¶¶ 116-19, 121, 123-24, 130 (offering various explanations why Defendant's electronic records revealed Plaintiff to be engaging in certain activities at certain locations, while his self-reports were different).

As a result of the investigation, Ms. Hastings convened a pre-disciplinary conference regarding Plaintiff. In her report regarding the same, Ms. Hastings summarized a variety of infractions, the most serious of which being her conclusion that Plaintiff repeatedly had falsified his service histories and time sheets. *See* Doc. 21-2 at pg. 109 of 162. In the report's "employee explanations" section, Ms. Hastings summarized a number of Plaintiff's explanations,

including his grievances regarding perceived problems with his electronic equipment,

his admitted shortcomings in record-keeping, and his stated belief that cell phone records could

not be trusted.  *See id.* at pgs. 109-14 of 162.  Ms. Hastings was unpersuaded, writing:

> [Plaintiff] is a short-[tenured] employee with an extensive disciplinary record. While it is acknowledged that his disciplinary history has primarily dealt with his inappropriate behavior, it is important to remember what prompted one of his first counseling sessions[, the incident in which he told Ms. Hopkins,] "[i]f you were a guy, I would punch you in the head."  That counseling session was regarding an incident where it was learned that [Plaintiff] did not report to work or request leave for the day.  It appears that this behavior has continued.

> It is a matter of regular practice and procedure that DLRs input their activity into their . . . [computer] notebook as they perform their duties.  DLRs have been instructed that if they cannot input service histories because the computer is not working or is at headquarters, they must keep paper time sheets then input that information into the [computer] when it is working.  However, [Plaintiff] has not been doing this, despite recent counseling sessions.  While this behavior was getting ready to be addressed in a pre-disciplinary conference, it was discovered that [he] was not in the field as required, but at home [on] June 24, 2010.

> . . . .  After reviewing all of the records and his claims of where he was working, it is clear that there are serious concerns that he is not where he says he is and that he is not working as he should be.

> His claims that he was not in the purported areas where the cell phone towers have clocked his calls is not credible.[12]  Many of the dates in question are on days when [Plaintiff] claims he is "cold calling" in his territory.  Additionally, [Plaintiff] has never turned in a specific listing of what businesses he called on during these days as he is required to do.  There is a procedure where[by] DLRs [can provide this information], . . . yet, [Plaintiff] has never [followed it] and does

---

[12]  In opposing summary judgment, Plaintiff has submitted a favorable unemployment compensation ruling in which, somewhat surprisingly, the referee accepted Plaintiff's "cell tower" arguments, finding the records insufficiently reliable for Defendant to carry its burden of showing that Plaintiff engaged in willful misconduct.  *See* Doc. 24-4 at pgs. 92-93 of 139.  Plaintiff does not rely heavily on the referee's decision, most likely because she also found that Plaintiff's being home from work on June 24, 2010, and an incident at "the Coraopolis Rite-Aid," did constitute "willful misconduct."  *See id.* at pg. 93.  Notably, the referee's decision expressly declined to consider "[the] other disciplinary actions taken against [Plaintiff] which were also considered in the discharge" under Defendant's progressive discipline system.  *Id.* at pg. 92.  Most critically, however, the anti-discrimination laws do not require Defendant to have been correct in its determinations, just non-retaliatory.  *See* Analysis section, *infra*.

not have any real records to document his purported cold calling.  These procedures have been reviewed with all DLRs in staff meetings.

While there were many issues addressed during this pre-disciplinary conference, it is clear that [Plaintiff] does not follow the required procedures and has not been performing his duties as expected. . . .  [DLRs] are entrusted by the Department to be honest, professional and accountable.  [Plaintiff] has falsified his service histories and time sheets on numerous occasions . . . .  A comprehensive investigation was conducted in an effort to provide some acceptable explanation [for] his actions but none can be found.

A review of our disciplinary database shows [that] disciplinary action for infractions such as this range from written reprimands to termination, with termination usually resulting for egregious infractions or as part of the progressive disciplinary process.  [Plaintiff] is a short-[tenured] employee with a Final Warning on record.  While this Final Warning is for behavioral issues, [Plaintiff] shows no signs of remorse or acknowledgment that his behaviors are wrong and inappropriate.  His past behaviors, which have been addressed through serious discipline, have not resulted in any significant changes in his behavior. He . . . believes that he does not have to follow the rules and/or respect his manager and co-workers due to his political connections.  There is no indication that [Plaintiff] will change his behavior or that he will ever be a productive, trust-worthy employee.  Based on these considerations, as well as the seriousness of his infractions, termination is recommended.

Doc. 21-2 at pgs. 114-15 of 162.

Although Plaintiff remains steadfast in his position that Ms. Hastings's opinions were "severely influenced by [Ms.] Hopkins," he concedes that Ms. Hastings made the recommendation that he be terminated and that Secretary Hassell agreed.  In a letter dated August 16, 2010, Secretary Hassell provided Plaintiff with "official notification" of his termination, citing his falsification of service histories and time sheets and his history of disciplinary actions.  Doc. 21-2 at pg. 47 of 162.

## ANALYSIS

At the onset, it is important to note that the Supreme Court, in its recent *Nassar* decision, clarified the causation standard applicable to retaliation claims brought under Title VII. Specifically, the Court determined that an employee-plaintiff must establish that his protected activity was a "but-for" cause of the adverse employment action.  Verma v. Univ. of Pa., 533 Fed. Appx. 115, 119 (3d Cir. Aug. 7, 2013) (applying Univ. of Tex. Sw. Med. Ctr. v. Nassar, -- U.S. --, 133 S. Ct. 2517, 2534 (2013)).  *Nassar* rejected the previously-applied, and less-demanding, "motivating factor" test, and the law now requires a plaintiff to show that "the causal link between injury and wrong is so close that the injury would not have occurred but for the [retaliatory] act."  *Id.* at 2522-23; *see also id.* at 2531-32 (concluding that more rigorous causation standard is necessary to abate proliferation of frivolous retaliation claims).

Courts in this Circuit have assumed that *Nassar* applies retroactively, and other courts expressly have so held.  *See, e.g.*, Verma at 119 *and* Jimmy v. Elwyn, Inc., 2014 WL 630605, *12 (E.D. Pa. Feb. 18, 2014) (applying *Nassar* in cases where adverse employment decision predated Supreme Court's decision); *see also* Sass v. MTA Bus Co., 2014 WL 585418, *5 (E.D.N.Y. Feb. 14, 2014) ("the new standard for retaliation applies retroactively to all cases still open on direct review") *and* Cassotto v. Potter, 2013 U.S. Dist. LEXIS 111752, *2-3 (D. Conn. Aug. 8, 2013) (holding same).  Plaintiff does not dispute that *Nassar* applies, and the Court joins the ones before it in concluding that the but-for standard applies, regardless of whether the adverse employment decision (or filing of suit) predated the Supreme Court's decision.

Courts routinely have applied *Nassar* at the summary judgment stage, and have granted judgment in favor of the employer where the plaintiff's termination would have occurred regardless of any alleged retaliatory motive.  *See, e.g.*, Verma *and* Jimmy.  Although the Court

does not believe that Plaintiff could survive even the more lenient "motivating factor" test, he most certainly fails under the "but-for" standard.

As previously referenced, Plaintiff attempts to string together numerous adverse reactions to his conduct, from a wide array of superiors, laying all blame at Ms. Hopkins's feet. Even reading the evidence in a light most favorable to Plaintiff, the record does not, and cannot, support his central theme that Ms. Hopkins was the grand orchestrator of all disciplinary incidents and his ultimate termination.  As seen above, *many* of Plaintiff's superiors observed, reported and responded to various instances of misconduct, and a litany of individuals participated in his various disciplinary and counseling sessions.  Even a cursory examination of the facts summarized above reveals gaping holes in Plaintiff's narrative, including instances where *he himself admits* to the misconduct in question, not to mention at least one incident (*i.e.*, the "punch in the head" statement) where his interpretation, if accepted, essentially would require the Court to endorse a "blame the victim" mentality.  *See, e.g.*, discussions *supra* regarding incidents in May 2006 (Mr. Blaskiewicz reported that Plaintiff was "out of line and rude to [Ms. Hopkins]"); January 2, 2008 (discipline resulted from Plaintiff's admitted statement to Ms. Hopkins that, "[i]f you were a man, I would punch you in the head"); February 6, 2008 (female coworker submitted detailed written reports of sexual harassment against Plaintiff, allegations that were <u>not</u> allegedly fabricated at behest of Ms. Hopkins); February 2, 2010 (accusing Ms. Hopkins of misstating that Plaintiff "hung up" phone on her, when, by his own accounts, the call had "dropped" or "he was not aware that [Ms. Hopkins] was still talking"); *and* June 26, 2010 (where record reveals that, despite insinuation that Ms. Hopkins "caused" Ms. Hastings to investigate Plaintiff's time and phone records, both Ms. Hopkins *and* Ms. Gill discovered that Plaintiff was home during work hours, and both reported incident).

Given Ms. Hopkins's position in the hierarchy of Plaintiff's supervision, it is hardly surprising, if not inevitable, that she had some involvement in the disciplinary actions and counseling efforts made in connection with Plaintiff.  To the extent the record reflects Ms. Hopkins's involvement, it was, in the Court's view, obvious and unavoidable, and in any event it is plainly insufficient to reasonably conclude that Plaintiff would not have been disciplined, and ultimately terminated, but-for her alleged retaliatory motive.  Any number of Plaintiff's actions, including conduct to which he candidly has admitted, would have justified adverse employment action, and the *Nassar* standards warrant a grant of summary judgment in Defendant's favor.

Even under the more forgiving "motivating factor" standard, Plaintiff would lose.  In the particularly apposite decisions of Weston and Hussein, the Court of Appeals for the Third Circuit rejected theories analogous to Plaintiff's here.  In those cases, the Court rejected the employee-plaintiffs' suggestion that their supervisors' having "play[ed] a role" in the adverse employment decision was sufficient, as no reasonable inference could be drawn that the ultimate decisionmakers shared any retaliatory animus.  *See* Hussein v. UPMC Mercy Hosp., 466 Fed. Appx. 108, 113 (3d Cir. Feb. 24, 2012) (quoting and analogizing decision in Weston v. Pa., 251 F.3d 420, 424 (3d Cir. 2001)).  Here, Plaintiff offers no evidence that the various decisionmakers in any way carried a retaliatory animus, and summary judgment is warranted.

The case law addressing temporal proximity, as an element of causal connection, further supports the Court's conclusions.  As noted above, Plaintiff's termination occurred over 1000 days after his initial complaints of sexual harassment.  Even accepting Plaintiff's unfounded supposition that Ms. Hopkins's presence constitutes a "magical thread" that may bridge any valley, the record reveals, and Plaintiff's briefing acknowledges, a gap of over

500 days between his disciplinary incidents in February 2008 and January 2010.  *See* Pl.'s Opp'n Br. (Doc. 24) at 12 (Plaintiff "lasted almost . . . two years without any discipline").  Although Plaintiff no doubt would attribute to Ms. Hopkins a remarkably impressive "long game," Plaintiff's theory comports with neither common sense nor the law.  *Cf., e.g.*, Peace-Wickham v. Walls, 2010 WL 5166387, *10 (3d Cir. Dec. 21, 2010) (eight-month gap between protected activity and adverse action presented "too attenuated . . . a link to establish causality"); Murphy v. S'eastern Pa. Transp. Auth., 2010 WL 571799, *7 (E.D. Pa. Feb. 12, 2010) (citing decision finding no causal connection in case involving one-year gap, and stating that "*post hoc* efforts to piece together certain events to create a [pattern of] . . . retaliation . . . fail[ed] to withstand summary judgment scrutiny"); *cf. also generally* Jimmy, 2014 WL 630605, *11-12 (although passage of time is not "legally conclusive," it is relevant to causation determination) (citations omitted).

Finally, the Court finds it noteworthy that the *only* indication Plaintiff ever gave to Defendant regarding Ms. Hopkins's perceived animus, prior to the filing of his EEOC charge, was that their relationship had soured when he fell outside her "inner circle" by refusing to provide her information regarding co-workers that she disfavored.  *See* discussion *supra* (citing records indicating Plaintiff's belief that relationship "eroded" as "a result of [his] refusal to provide her with 'dirt' concerning other employees"); *see also* Pl.'s Resp. to Facts at ¶ 93 (admitting that Plaintiff complained to Defendant of Ms. Hopkins's "inner circle," and citing fact that only ten of eighteen DLRs were invited to party held for her).  Although Plaintiff's allegations of cattiness and favoritism, if true, may be distasteful, they are no substitute for evidence of unlawful retaliation.  *See* Reliford-Thomas v. Eli Lilly & Co., 2013 WL 839885, *9 (S.D. Ind. Mar. 6, 2013) ("[f]avoritism is not unlawful . . . as long as it is not based upon a

protected category") (citation to quoted source omitted).  Along the same lines, Plaintiff's

"pivot," from allegations of cattiness and non-retaliatory favoritism to claims of retaliation based

on protected activity, appears akin to a post-termination, litigation-motivated rationalization,

a charge more commonly leveled against employers in the discrimination context.  *Cf.* Rodriguez

v. Auto Zone, 2014 WL 197894, *6 (D. N.J. Jan. 14, 2014) ("[a]ctions for retaliatory discharge

will not be successful where [claims] of employer misconduct are obviously raised as a

'smokescreen' in challenge to . . . supervisor[s'] legitimate criticism[s]" ) (citation to quoted

source omitted).[13]

       As it likely goes without saying, Defendant also is entitled to summary judgment based

on Plaintiff's inability to establish pretext.  Although Plaintiff appears ever-ready to offer

alternative explanations for each and every incident of misconduct in the record, no reasonable

jury could accept those explanations given Plaintiff's frank admissions of misconduct, as well as

the fact that Defendant was not required to be "correct" in every instance.  Time and again,

Plaintiff has attempted to argue that his supervisors' perceptions regarding his conduct or

statements were misunderstood or not consistent with his intentions.  While the Court disagrees,

in many cases, that Plaintiff's conduct or statements could be subject to multiple interpretations,

even if the Court were to credit Plaintiff's protestations, the legal standard is *not* whether

Defendant was "right," but whether its reasons were pretext for retaliation.  *Compare, e.g.*, Pl.'s

Resp. to Facts at ¶ 29 (denying materiality of "punch in the head" statement because Ms.

Hopkins "did not [actually] feel threatened") *and id.* at ¶ 124 (responding to allegations of

falsifying records with explanations that he went without his computer for three months, and that

---

[13]  Although the Court believes it far more likely than not that Plaintiff's allegations of retaliation
are a "smokescreen," the Court expressly declines to rely on this conclusion for the purposes of
summary judgment.  Plaintiff cannot survive the causation standards referenced above, and that
is the reason Defendant's Motion will be granted.

entries he made in computer did not appear in reports generated by Ms. Gill) *with* Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (["t]o discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether [retaliatory] animus motivated the employer, not whether the employer [was] wise, shrewd, prudent, or competent") (citations omitted).

Finally, Plaintiff's underlying claims of sexual harassment may be summarily rejected. Plaintiff filed his EEOC charge in June 2011, and the alleged harassing behavior ceased in 2007. Plaintiff clearly is time barred, and even if he was not, his admission that the harassment promptly ceased is fatal to his claims.  *Compare* Pl.'s Dep. Tr. at 117-18 *with* Miller v. Patterson Motors, Inc., 2009 WL 789897, *16 (W.D. Pa. Mar. 24, 2009) ("[i]f an employer's response to notice of harassment effectively stops the harassment, said response [is deemed] adequate as a matter of law") (citation to binding Third Circuit authority omitted).

For all of the reasons stated above, the Court hereby enters the following:

## II.  **ORDER**

Defendant's Motion for Summary Judgment (**Doc. 20**) is **GRANTED**.


March 25, 2014                                    s\Cathy Bissoon_____
                                                 Cathy Bissoon
                                                 United States District Judge

cc (via ECF email notification):

All Counsel of Record